UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


| | | |
|---|---|---|
| CHRISTOPHER CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:13CV0114 JMB |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |


## MEMORANDUM AND ORDER

Plaintiff Christopher Clark brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3)

for judicial review of the Commissioner's final decision denying his applications for disability

insurance benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401,

*et seq.*, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§

1381, *et seq.* All matters are pending before the undersigned United States Magistrate Judge,

with consent of the parties, pursuant to 28 U.S.C. § 636(c). Because the final decision is

supported by substantial evidence on the record as a whole, it is affirmed.[1]

**I. Procedural History**

On October 24, 2008, the Social Security Administration denied Plaintiff's July 30, 2008,

applications for DIB and SSI in which he claimed he became disabled on February 1, 2001,[2] due

to chronic low back pain, a spine injury, knee injury, elbow injury, arthritis and degenerative disc

---

[1]    The undersigned has reviewed the entirety of the administrative record in
determining whether the Commissioner's adverse decision is supported by substantial evidence.
The recitation of specific evidence in this Memorandum and Order, however, is limited to that
evidence relating to the issues raised by Plaintiff in this appeal.

[2]    Plaintiff initially alleged disability beginning February 1, 2001, but during the course

disease. (Tr.[3] 115)  Plaintiff filed a timely request for a hearing before an Administrative Law Judge (ALJ) and then testified at the September 29, 2010 hearing convened by the ALJ. *Id.* On December 10, 2010, the ALJ issued a decision denying Plaintiff's applications for benefits, (Tr. 119-37), and Plaintiff then filed a timely request for review by the Appeals Council. By order dated February 24, 2012, the Appeals Council remanded the case to the ALJ for further proceedings. (Tr. 142-44, 217)  On August 24, 2012, Plaintiff appeared and testified at a second hearing before a different ALJ. (Tr. 15)  By hearing decision dated October 23, 2012, the ALJ again denied Plaintiff's applications. (Tr. 15-27)  Plaintiff made a timely request for review of the hearing decision and by order dated October 28, 2013, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's October 23, 2012 decision as the final decision of the Commissioner and exhausting Plaintiff's administrative remedies. (Tr. 1-6, 10-11)

In his current request for judicial review, Plaintiff asserts that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole. He argues that the ALJ erred in determining his residual functional capacity (RFC): (1) by failing to include limitations suggested by the evidence of record; (2) by failing to afford proper weight to the opinions of Dr. Wen,[4] Plaintiff's treating physician; and (3) by failing to appropriately assess the credibility of Plaintiff's subjective complaints.

Asserting that the ALJ's decision is supported by substantial evidence, Defendant points to portions of the medical record demonstrating unremarkable results and findings on physical exam and from diagnostic testing, the success of conservative medical treatment and physical

---

of his hearings amended his alleged onset of disability to June 30, 2006. (Tr. 41, 73)

[3]  References to "Tr." are to the administrative record filed by Defendant. Doc. No. 12.

[4]  The Court notes that Dr. Wen's name also appears with the spelling "Nguyen" in the administrative record. The Court adopts the spelling, "Wen," because that spelling is the one used by the physician in his own notes and records.

therapy in alleviating Plaintiff's symptoms, the daily activities in which he continued to participate and his failure to seek treatment for a four-year period. Defendant argues that this evidence supports a determination that the ALJ properly assigned an RFC for light work, appropriately discounted the opinions of Plaintiff's treating physician and gave sufficient reasons for questioning the credibility of Plaintiff's subjective complaints of pain.

## II. Testimony before the ALJ

A. *Plaintiff's Testimony (Tr. 37-60, 68-102)*

The hearing transcripts from the September 29, 2010 and August 24, 2012 hearings reflect the following pertinent testimony.

Plaintiff was born on May 11, 1975 and at the time of the first hearing, was thirty-five year of age. He completed high school and obtained a diploma. Plaintiff is divorced and has two minor children but does not live with them. Since approximately 1999, Plaintiff has resided in numerous locations with friends and relatives having been unable to rent an apartment due to his lack of funds and employment. Throughout the time period relevant to these applications, Plaintiff had no medical insurance. He applied for but was denied Medicaid coverage.

Plaintiff's Work History Report shows that, from 1993 through 1994, he delivered auto parts for an auto parts supplier, and from 1994 through 1996 worked as a package handler and delivery person. From 1997 through 1999, Plaintiff also worked as a private security officer for two different security companies. For seven months from late 2000 through mid-2001, Plaintiff worked in the office of a pay-day-loan company. Plaintiff testified that this employer dismissed him due to repeated absences occasioned by his physical therapy sessions and that he last applied for other work in 2001. He testified that he was refused work at that time due to his back problems and that he believes his injuries have continued to prevent him from obtaining work. He further testified that he has not been gainfully employed since June of 2006.

Plaintiff testified that his difficulties began in August of 1999 when he was leaving his home *en route* to work, lost his footing, fell headfirst down a flight of approximately fourteen stairs and landed on his right side on a concrete pad at the base of the stairs. Plaintiff experienced extreme pain in his lower back and right knee and stated that he lay at the base of the stairs for approximately fifteen minutes. Because he had no health insurance at the time, Plaintiff refused an offer from a bystander to call 911. Fearing that he would lose his job if he did not do so, he reported to work despite pain, torn clothing and obvious injuries. When Plaintiff arrived at work the client noticed his torn clothing and discomfort, and upon learning what had happened, instructed Plaintiff to call his supervisor. Plaintiff's supervisor arrived and instructed him to seek medical attention.

Plaintiff was placed on bed rest for approximately thirty days after the fall and released to return to work in November of 1999. At that time, he chose to take unpaid leave and seek a transfer to another work location. He resigned from his position as a security guard in February of 2000 when his unpaid leave expired.

Plaintiff testified that he filed a personal injury lawsuit after his fall, but that the attorney representing him dropped the case prior to the scheduled trial date. He further testified that he did not file for Social Security benefits until 2008 because he was only advised to do so after his personal injury law suit failed to go forward.

Plaintiff testified that he has experienced intermittent, severe pain in his back and right knee since the fall, and that he has some good days and many bad days. He also experiences sciatica and shooting pain in his legs, and testified that this pain has gotten worse since the accident. Plaintiff testified that he has had a good deal of physical therapy and chiropractic treatment, but that he was unable to continue and complete the physical therapy regimen recommended by his doctor due to his lack of medical insurance and inability to pay. Plaintiff

testified that he has seen the same primary care physician, Dr. Wen, since 2003, but that his appointments with him have been relatively infrequent due to his lack of health insurance.

For relief of pain, Plaintiff takes over-the-counter pain medication such as ibuprofen and acetaminophen. Since June of 2006 Plaintiff has, at different times, been prescribed Vicodin, Oxycodone, Xanax, Vioxx, Soma, Valium, Librium, Percocet, Tramadol, and Neurontin. At the time of the hearings he was taking Oxycodone and testified that he experienced side-effects including confusion, loss of focus, fatigue, loss of agility, loss of appetite, nausea, and photophobia. Plaintiff further testified that, due to the side-effects of his medications, he had not found the prescription medications very helpful and that he gets the most relief from lying down and applying heat to his back.

With respect to activities of daily living, Plaintiff testified that he arises between 8 a.m. and 9 a.m., goes to bed around 11p.m., and that pain interferes with his sleep on most nights. Plaintiff dresses, bathes and grooms himself; prepares his own simple meals; washes his dishes and takes out the garbage, unless it is heavy; cannot do yard work; drives only short distances due to his pain, but tries to do so on a daily basis to visit family and friends or go to the library. Unless his pain interferes, he attends church once a week and goes food shopping once a month, sometimes using a motorized cart. He tries to attend his sons' events for school or scouting, although his pain makes it difficult to participate in these activities as much as he would like. Plaintiff testified that, due to his lack of funds, he has no bank account and few financial matters to attend to but keeps up with the few bills he has and manages his own appointments. Plaintiff further testified that he does not have a cell phone or a computer and although he uses the Internet on a library computer, he does not play computer games or use social media. His chief activity on a good day is reading and he principally reads the Bible and books he borrows from the library.

With respect to exertional restrictions, Plaintiff testified that on his bad days, which occur approximately two times a week, he has to lie down for thirty minutes or so every three hours. Plaintiff testified that physical activity aggravates his pain. He avoids lifting and carrying but, if necessary could lift fifteen to twenty pounds, although he could not repeatedly lift or carry such weight. Plaintiff also testified that he cannot crawl, kneel or stoop and can bend only a little. He is unable to walk or sit for more than thirty minutes or to stand for any sustained period of time, especially on concrete or other hard surfaces. Plaintiff testified that he has no difficulty reaching above his head, unless he is lifting weight at the same time, and that he can reach in all other directions frequently so long as he is not holding anything heavy. Finally, Plaintiff testified that he has no particular problem with the use of his hands. Plaintiff further testified that since the injury he has had difficulty with depression but that he has not taken medication or seen a mental health provider for his depression since 2006. Plaintiff also stated that he experienced anxiety and panic attacks related to his interactions with attorneys in the context of his personal injury lawsuit. He also becomes anxious when he is unable to participate in activities with family and friends.

B. *Vocational Expert Testimony*

1. The September 29, 2010 Hearing (Tr. 103-12)

Denise Waddell, a vocational rehabilitation consultant (VE), testified at the hearing in response to questions posed by the ALJ and counsel. The VE classified Plaintiff's past relevant work as follows: package deliverer, medium exertional level, unskilled; security guard, light exertional level, semi-skilled; and check cashier, sedentary, semi-skilled. (Tr. 104) The ALJ asked the VE to assume that Plaintiff was limited to sedentary work and could only occasionally climb ramps and stairs, balance or stoop. In addition, the ALJ asked the VE to assume that Plaintiff could never climb ropes, ladders or scaffolds, and never kneel, crouch or crawl, but

could sit for twenty minutes at a time before having to stand at his work station for at least three minutes.  The ALJ also asked the VE to assume that Plaintiff would have to avoid exposure to vibration and might require a one-handed assistive device to ambulate.  Given those assumptions, the VE testified that Plaintiff could perform his past work as a check cashier.

The ALJ next asked the VE whether, if the check cashier position did not exist or Plaintiff was unable to perform it, there were any other jobs that a hypothetical individual of Plaintiff's age, education, vocational background and RFC could perform.  The VE responded that at the sedentary exertional level, such a person could work as an order clerk, of which 1,200 such jobs exist in the State of Missouri and 75,000 nationally; as a production checker, of which 700 such jobs exist in the State of Missouri and 39,000 nationally; or as a lens inserter, of which fifty such jobs exist in the State of Missouri and 20,000 nationally.  (Tr. 104-05)

The ALJ then asked the VE to assume that that the hypothetical individual could only understand, remember and carryout simple instructions; make only simple work-related decisions; deal with only occasional changes in the work process or environment; and have no face-to-face contact with the general public and to determine whether these restrictions would alter her previous testimony.  The VE testified that the additional restrictions would not disqualify the hypothetical individual from performing the jobs she had identified.

In response to the ALJ's inquiry, the VE next testified that any production or performance quotas applicable to the identified positions would not affect the hypothetical individual's ability to perform those jobs.  Finally, the VE testified that no more than one absence, instance of tardiness or early departure per month would be tolerated in the positions she had identified.

Counsel then questioned the VE and asked her to assume a hypothetical individual of Plaintiff's age, education, and work experience who could only occasionally[5] kneel, squat, crawl, stand, walk, climb stairs, bend or twist; only occasionally lift or carry without reference to weight; and who must be able to change positions at will throughout the work day. The VE stated that such an individual would not be able to perform Plaintiff's past relevant work. When asked if such a person could perform any other competitive work at the sedentary exertional level, the VE responded that due to the need to change position at will there were no jobs that such an individual would be able to perform.[6] Counsel next asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience who suffers from the limitations noted in Exhibit 10F, an August 13, 2009 medical source statement submitted by Dr. Wen, Plaintiff's primary care physician. The VE stated that such an individual could not perform Plaintiff's past relevant work or any other work. The VE explained that her answer was predicated on the following restrictions set forth in Exhibit 10F: frequent interference with attention and concentration; an inability to perform even low stress jobs; the inability to stand for more than ten to fifteen minutes; and the need to recline for a few minutes every one to two hours. Counsel next asked the VE to assume a hypothetical individual of Plaintiff's age, education and work experience who suffers from the limitations noted in Exhibit 14F, a September 2, 2010 medical source statement submitted by Dr. Wen. The VE again stated that such an individual could not perform Plaintiff's past relevant work or any other work, and that her answer was predicated on the restrictions also noted in the medical source statement completed by Dr. Wen a year earlier.

---

[5]     Counsel defined the term "occasionally" in accordance with "Social Security definitions" to mean a maximum of two and one-half hours in an eight-hour day.  (Tr. 107)
[6]     The VE testified that the need to change position more than every twenty minutes interferes with productivity and thus precludes employment in a competitive work environment.

2. <u>The August 24, 2012 Hearing (Tr. 60-67)</u>

After obtaining some additional information from Plaintiff regarding his past work, Gary Weimholt, (VE), testified at the hearing in response to questions posed by the ALJ and counsel. The VE classified Plaintiff's past relevant work as a security guard as light and semi-skilled but noted that many such jobs require the ability to lift twenty to fifty pounds and, in metropolitan areas, a certification course. The VE classified the job Plaintiff held at the loan company as a customer service representative for a financial organization at the light exertional level, semi-skilled. The ALJ asked the VE to assume an individual of Plaintiff's age, education and work background, able to lift and carry twenty pounds, occasionally, and ten pounds, frequently; and able to walk for two hours of an eight hour work day but requiring the opportunity to alternate between sitting and standing at will. The ALJ asked the VE to further assume that individual would be able to climb ramps and stairs for a total of two hours out of an eight-hour day but would be unable to climb ropes, ladders or scaffolds or walk on uneven surfaces; and able only occasionally to stoop, crouch or crawl. In addition, the hypothetical individual would need to avoid hazards such as dangerous machinery or unprotected heights. Given those assumptions, the VE testified that Plaintiff would be able to perform the following jobs: unskilled cashier, of which 1,200 such jobs exist in the State of Missouri and 60,000, nationally; inspector and hand packager, of which 1,200 such jobs exist in the State of Missouri and 60,000 nationally; and parking lot attendant, of which 1500 such jobs exist in the State of Missouri and at least 75,000 nationally. (Tr. 66-67) The VE testified that his description of the jobs was consistent with the Dictionary of Occupational Titles (DOT) except for the fact that the DOT does not include in its job descriptions the opportunity for the worker to alternate between sitting and standing. The

_____

(Tr. 108)

ALJ than asked the VE to assume the hypothetical individual and restrictions he had previously described together with the additional requirement that throughout the work day the individual would need to take two additional breaks varying in length from fifteen to thirty minutes. The VE testified that the proposed additional breaks would be incompatible with maintaining any sort of competitive employment. The ALJ then offered counsel the opportunity to further question the VE, but counsel declined to do so.

### III. Statements from Family Members and Friends (Tr. 369-80)

Plaintiff submitted written statements from his mother, father, sister and a long-time friend describing their observations of Plaintiff's symptoms, and his capabilities, limitations and restrictions with respect to activities of daily living. The statements are generally consistent with one another and with Plaintiff's testimony regarding the same matters.

### IV. Medical Evidence (Tr. 413-680)

A. *Objective Diagnostic Testing*

X rays of Plaintiff's lumbar spine taken on October 15, 1999, approximately two months after the fall, showed "lysis of the *pars articularis* of L5 on the left." (Tr. 413) All vertebral bodies were well aligned and all joint spaces maintained. (*Id.*) No fractures or dislocation of the spine and no significant bony abnormalities were noted. (Tr. 414) A July 1, 2003 MRI ordered by Dr. Wen revealed mild levoscoliosis[7] in the lumbar spine, and a minimal disk bulge at L3-L4, minimally impressing on the thecal sac.[8] (Tr. 430-31) The MRI also revealed loss of T2 signal[9]

---

[7]    "Levoscoliosis" refers to side-to-side curvature of the spine. "Scoliosis," Wikipedia: The Free Encyclopedia. Wikimedia Foundation, Inc., (17 April 2015); Web. (28 April 2015); http://en.wikipedia.org/wiki/Scoliosis/

[8]    The thecal sac, a membrane that surrounds the spinal cord and the *cauda equina* or lumbar nerve bundle, is filled with cerebral spinal fluid. "Thecal sac," Wikipedia: The Free Encyclopedia. Wikimedia Foundation, Inc., (3 October 2014); Web. (28 April 2015); http://en.wikipedia.org/wiki/Thecal_sac/

[9]    "T2 signals" are MRI emissions which correlate to the quantity of water present in

related to disc desiccation at the L4-L5 and L5-S1 levels and mild retrolisthesis[10] of L4 and L5 related to degenerative disc disease.[11] (*Id.*) A rudimentary disc was noted between S1 and S2 and a 9mm hemangioma[12] was noted at the S4 vertebral body. (*Id.*) The report further indicated that the general impression was of disc bulges and degenerative changes without evidence of stenosis or disc herniation with extrusion or nerve root impingement. (*Id.*)

X rays of the lumbar spine, ordered by Dr. Wen and taken on October 14, 2008, due to Plaintiff's complaints of chronic low back pain and bilateral sciatica, showed intact pedicles,[13] no spondylothithesis,[14] patent sacroiliac joints and no compression deformities. X rays taken on flexion and extension showed no abnormal movement of vertebral bodies or spondylolisthesis. The overall impression as stated in the radiologist's report was "no acute compression fractures or spondylolisthesis." (Tr. 517)

X rays taken in August of 2012, revealed a mild pelvic tilt. (Tr. 627- 29) As interpreted by a treating chiropractor, an MRI performed around the same time indicated that the lowest three discs were bulging into the spinal canal. (Tr. 621-26)

---

the tissue being examined. "T2 signal abnormality," MedHelpwww.medhelp.org/posts/Neurology/T2-signal-abnormality (8 June 2005); Web. (28 April 2015).

[10] "Retrolisthesis" is the backward displacement of a vertebra, especially the fifth lumbar vertebra, most commonly occurring after a break or fracture**. "Retrolisthesis,"** Wikipedia: The Free Encyclopedia. Wikimedia Foundation, Inc., (9 October 2014); Web. (28 April 2015) http://en.wikipedia.org/wiki/Retrolisthesis/

[11] References to "L", "S," and "T" signify the lumbar, sacral, and thoracic regions of the spine, respectively. Numerals are assigned in descending order to designate the vertebra and spinal nerves within each region. Stedman's Medical Dictionary A17, A18 (28th ed. 2006).

[12] A "hemangioma" is a benign and, most commonly, asymptomatic build- up of blood vessels. Stedman's Medical Dictionary 861 (28th ed. 2006).

[13] "Pedicles" are bony extensions on the sides of the vertebral body. Stedman's Medical Dictionary 1446 (28th ed. 2006).

[14] "Spondylolisthesis" is the forward displacement of a vertebra, especially the fifth lumbar vertebra, most commonly occurring after a break or fracture. Stedman's Medical

B.    *Treatment Notes (Tr. 413-638)*

On October 15, 1999, a little more than two months after his fall, Plaintiff was seen by Walter B. Greene, M.D., at the orthopedic surgery clinic of University Hospital in Columbia, Missouri, for evaluation of the injury due to continuing pain.  Plaintiff reported that his back pain, although persistent, had improved since his injury and that he had no bowel or bladder discomfort.  Dr. Greene's notes regarding the physical exam describe a healthy appearing, 6'3,'' 197 lb. male with a straight, aligned spine; legs of equal length; flexion to mid-calf and extension to twenty degrees, with pain on extension.  Motor and sensory nerves were intact to L1-S1, the lumbar sacral region, and Plaintiff could perform straight leg raises bilaterally to seventy degrees without pain.[15]  The doctor's impression was of severe paraspinal lumbar strain.  He recommended that Plaintiff start a regimen of physical therapy two to three times a week for eight weeks and prescribed diazepam and hydrocodone for pain. (Tr. 413-27)

During a November 12, 1999 follow up appointment, Plaintiff reported no significant back pain and a good response to physical therapy.  Dr. Greene noted that Plaintiff's gait was normal and released him to return to work.

From October 22, 1999, through December 7, 1999, Plaintiff participated in twelve physical therapy sessions.  He reported that his back was "feeling a lot better" and that the exercises were helpful.  In addition, during this time Plaintiff reported that he had worked on

---

Dictionary 1813 (28th ed. 2006).
    [15]    The straight leg raise, also called Lasègue's sign, is a test done during the physical examination to determine whether a patient with low back pain has an underlying herniated disk, often located at L5, the fifth lumbar spinal nerve.  "The Straight-Leg Test for Evaluating Low Back Pain" *Web*MD (12 March 2014) Web. (28 April 2015); http://www.webmd.com/a-to-z-guides/straight-leg-test-for-evaluating-low-back-pain-topic-overview.  If the patient experiences sciatic pain when the straightened leg is at an angle of between thirty and seventy degrees, then

wiring an old house and played pool on several occasions.  Plaintiff was discharged from physical therapy on January 6, 2000.  (Tr. 428-80)

Throughout 2002 and early 2003, Plaintiff returned to the urgent care clinic at University Hospital complaining of back and knee pain and seeking refills for various prescription pain medications.  During this time period, Plaintiff was variously prescribed Vicodin, Diazepam, Tylenol 3, and Ultracet.  In May of 2003, Plaintiff again sought a refill of his pain medication. The examining physician instructed Plaintiff that he would no longer be permitted to obtain prescription refills for his pain medication at the urgent care center and that he should obtain a primary care physician to oversee his pain management and medication needs.  (Tr. 421-23)

On April 11, 2003, Plaintiff sought treatment from Laura J. Eaton, M.D., for low back pain, knee pain and stomach ulcers.  Records of Dr. Eaton's findings on physical examination indicate that Plaintiff complained of some discomfort in his knee, but there was no swelling or erythema.  In addition, the knee was stable to stress at both full extension and twenty percent flexion and exhibited no joint line tenderness or pain on extension.  With respect to Plaintiff's back, Dr. Eaton found that Plaintiff was capable of full back extension and 80 percent flexion, showed neither straight leg raise nor intention[16] signs and had normal toe and heel gaits.  Dr. Eaton noted that in the previous two to three months Plaintiff had participated in physical therapy and experienced improvement at least with respect to his knee.  (Tr.490-94)

From March of 2003 through early August of 2003, Plaintiff participated in physical therapy as prescribed Dr. Wen.  He attended fourteen sessions but failed to appear for eight scheduled sessions and arrived fifty minutes late for another.  (Tr. 440-57)

---

the test is positive and a herniated disc is likely the cause of the pain.  *Id.*

[16]  "Intention" is an indicator of malingering and "refer[s] to neurogenic abnormalities that arise when a goal is consciously sought." *See* Dorland's Illustrated Medical Dictionary 847

From June of 2003 through February of 2004, Plaintiff saw Dr. Wen on four occasions, for treatment of his ongoing back and knee pain. (Tr. 492-509). Dr. Wen ordered an MRI, the results of which are noted above, and diagnosed chronic low back pain as a result of degenerative disc disease with no evidence of radiculopathy.[17] He continued to recommend physical therapy. Noting that Plaintiff stated he was unable to pay for physical therapy services, Dr. Wen urged Plaintiff to exercise on his own. Dr. Wen also prescribed the use of a Transcutaneous Electrical Nerve Stimulator (TENS) unit and Ultram, Vioxx, Advil and Diazepam for relief of pain. (Tr. 492-509)

In June of 2004, Plaintiff was seen at the Bonar Chiropractic Clinic for complaints of back pain. (Tr. 532-36) The treating chiropractors, Drs. Harshmann and Davis, concurred on a diagnosis of "no apparent problem," but also identified mild arthritis and recommended physical therapy. When his knee again became painful, Plaintiff opted not to continue chiropractic care and instead planned to seek pain medication through the urgent care clinic. (Tr. 536)

Plaintiff sought chiropractic treatment in December 2006 for low back, knee and elbow pain. Medical records from the Bowers Chiropractic Clinic include a recommendation for twenty chiropractic visits to treat low back pain and a requirement that Plaintiff attend a Spinal Care Workshop. The record does not indicate whether Plaintiff followed this recommended treatment regimen. (Tr. 481-91)

After filing for disability, Plaintiff saw Dr. Wen for the first time in almost four years on January 29, 2008, at which time Dr. Wen's impression was of apparently disabling chronic low back pain without evidence of radiculopathy. Plaintiff alleged that his back pain had become

---

2[nd]ed. (2012).

[17] "Radiculopathy" is chronic pain of the back which radiates to the extremities. "Radiculopathy" Wikipedia: The Free Encyclopedia. Wikimedia Foundation, Inc., (27 April 2015); Web. (28 April 2015); http:/en.Wikipedia.org/wiki/Radiculopathy/.

more severe.  Dr. Wen noted that Plaintiff was presently taking Vicodin and Tramadol and discussed with Plaintiff the goal of maintaining his current functioning rather than the elimination of pain.  He advised that Plaintiff should strive to decrease and eventually wean himself from narcotic drugs to avoid their sedating side-effects and to reserve their use for more severe or break-through pain.  Dr. Wen prescribed Vicodin and added Neurontin, a non-narcotic "pain interrupter," to assist Plaintiff in decreasing his use of narcotic painkillers.  (Tr. 506-07)

Plaintiff returned to see Dr. Wen on March 12, 2008, complaining of nasal congestion, cough and some shortness of breath.  He had not continued taking the Neurontin because he felt "it didn't help" and had not used the fentanyl patch he had been prescribed between clinic visits because he found it extremely sedating.  Plaintiff reported taking a friend's higher dose Vicodin and believed that he had experienced fewer side-effects than with the lower dose Vicodin he had been taking.  Dr. Wen observed that Plaintiff seemed extremely tense and anxious, and after some discussion, prescribed Lithium as a mood stabilizer and Vicodin at the higher dose for pain relief.  (Tr. 507-09)

After an interval of more than two years and seven months, Plaintiff presented to Dr. Wen on August 18, 2010, complaining of low back pain, stress, anxiety and depression.  (Tr. 544-47)  Plaintiff asserted that he had continued to have chronic low back pain and also experienced, approximately once a month, a more severe pain that he called "nerve pain." (Tr. 545)  Plaintiff reported that he was taking Tylenol #3 and Soma for the "nerve pain."  (*Id.*) Plaintiff also told Dr. Wen that he was experiencing stress related to his application for disability benefits and noted that he had seen a psychiatrist in 1999 who had prescribed diazepam which helped him until 2006 at which time he was prescribed Xanax.  Plaintiff requested a note excusing him from wearing a seat belt due to the pain caused by the seat belt.  (Tr. 544-47)

Upon examination Dr. Wen noted that Plaintiff was in no acute distress and exhibited "no real thought process disorder," although his speech was pressured. (Tr. 546) Dr. Wen's physical examination of Plaintiff's back showed reasonable flexion and extension, normal curvature and no specific areas of tenderness. (*Id.*) In addition, he noted "negative the straight leg raise, intentions signs, bilaterally."[18] (*Id.*) Dr. Wen's impression was "chronic low back pain without any evidence of radiculopathy" and "a possible component of right greater trochanteric bursitis" that was not responsible for "the major portion of ["Plaintiff's] discomfort." (*Id.*)

In his notes Dr. Wen stated that he spent a long time during the August 18, 2010 appointment negotiating pain medications with Plaintiff. Dr. Wen stated he was very reluctant to give Plaintiff a higher strength or greater number of pills due to what he identified as "his propensity to dependency." (*Id.*) After the discussion, Dr. Wen continued Plaintiff on daily Tylenol #3 and Soma and gave him a prescription for four Percocet to last thirty days, to be used only as needed. The doctor declined to prescribe either Diazepam or Xanax or to write a note excusing Plaintiff from seat belt use. (*Id.*) Plaintiff did not schedule a return appointment citing his lack of insurance. (*Id.*)

On January 7, 2011, Dr. Wen wrote a letter stating that his failure to see Plaintiff in his office from 2004 to 2008 was due to Plaintiff's lack of health insurance. He further noted that because Plaintiff's condition was a "non-changing type of condition," he felt it appropriate to prescribe medication over the telephone without seeing Plaintiff in his office. (Tr. 570-71) He also stated that the gap in office visits "should not be construed as improvement or stability of [Plaintiff's] medical condition." (Tr. 570) Dr. Wen also wrote that "[e]ssentially [Plaintiff] is

---

[18] Defendant understands this finding by Dr. Wen to indicate a positive intention sign and argues that it is evidence of malingering. Given the wording, the Court finds it at least as likely that Dr. Wen was recording a negative intention sign as a positive one, especially because at a later time Dr. Wen affirmatively stated that Plaintiff was not a malingerer.

functional" and that his "occupational limitations ha[d] not changed over several years, since well before 2004." (Tr. 571)

Plaintiff next saw Dr. Wen on September 16, 2011, at which time Dr. Wen again observed that Plaintiff was a "36 –year-old with chronic low back pain who considers himself disabled." (Tr. 573) He stated that although he was in no acute distress, Plaintiff complained of low back and hip pain and right lower extremity discomfort. (*Id.*) Plaintiff reported that he used four Percocet per month for the more severe pain and that this worked well for him. He also reported that the pain was worse when he was walking or if he has been sitting for a long time, but that it had "not necessarily worsened over time." (*Id.*)

Dr. Wen opined that Plaintiff was not really describing radicular symptoms and that his pain was "most likely" the result of greater trochanteric bursal pain rather than L5 radicular symptoms. (Tr. 574) He recommended physical therapy and continued Plaintiff on Percocet. Plaintiff refused the doctor's offer of a greater trochanteric bursal injection for the relief of that pain. (*Id.*)

On February 15, 2012, Plaintiff visited an urgent care clinic due to severe low back pain with radiation to the legs. (Tr. 584) X-rays revealed loss of vertebral height at T8 in the thoracic spine, among other things. (Tr. 586) The physician recommended Ibuprofen and instructed Plaintiff to follow up with his primary care physician. (Tr. 587)

Plaintiff sought chiropractic treatment from Dr. Jeffrey Birkenmeir, D.C., in August of 2012. The chiropractic treatment records noted chronic spine, rib and pelvic pain. (Tr. 623) Plaintiff reported constant pain throughout the day, limitations in activities of daily living and rated his impairment at 7 out of 10 at rest and 9 out of 10 with activity. (Tr. 624-25) Dr. Birkenmeir diagnosed segmental dysfunction lumbar myositis, lumbar segmental dysfunction, lumbar paraspinal edema and other conditions of the low back and sacroiliac and recommended

manipulation and electrical stimulation. (Tr. 620-21) Dr. Birkenmeir's notes state that Plaintiff's condition had worsened over the twelve years since the fall. (Tr. 621) He noted present restrictions in Plaintiff's activities of daily living, but clearly expected improvement in those abilities following minimally invasive treatment such as manipulation and exercise. (*Id.*) Dr. Birkenmeier indicated that he did not expect a complete recovery but nevertheless stated that a "positive functional outcome is still expected." (*Id.*)

C. *Consultative Medical Examinations*

1. Dr. Zeimet, D.O. (Tr. 510-36)

On September 20, 2008, as part of the disability benefit process, Plaintiff presented for a consultative internal medicine examination conducted by Dr. Anthony P. Zeimet, D.O. Dr. Zeimet observed that Plaintiff was pleasant, alert and oriented, in no apparent distress, walked with a limp, able to get on and off the exam table with some minor difficulties, and able to get in and out of a chair with no difficulty. Plaintiff showed full motor strength in his lower extremities, no muscle atrophy or spasm, and no limitation in range of motion in either his upper or lower extremities or ankles. Plaintiff was able to walk without an assistive device but could not perform a heel-to- toe walk or walk on his heels or on his toes and could not squat. Dr. Zeimet also observed that Plaintiff had full range of motion in his cervical spine and lumbar spine, flexion and extension were decreased at about twenty degrees bilaterally and that the straight leg test was positive at sixty degrees on the right and forty degrees on the left. Dr. Zeiment's assessment was "chronic low back pain without any evidence of radiculopathy," and opined that Plaintiff would be unable to sustain even sedentary work.

2. Edward Martinson, M.D. (Tr. 537-43)

On September 7, 2010, Plaintiff was evaluated by Edward Martinson, M.D. Dr. Martinson noted an MRI revealing degenerative disc disease, among other issues. (Tr. 538) He

also noted Plaintiff's inability to obtain physical therapy since 2003 due to financial constraints. *Id*. Dr. Martinson noted left and right lower extremity symptoms. (Tr. 539) Plaintiff reported difficulties with shopping and other activities and rated his pain at 8 out of 10. (Tr. 539-540)

On examination, Dr. Martinson observed lumbar lordosis, back tenderness, soft tissue tightness in the shoulders and hips. His impressions were: multilevel degenerative disc disease, trochanteric bursitis in the hips and patellofemoral pain. Dr. Martinson stated his belief that Plaintiff's condition could "potentially limit him in regard to activities and options for ongoing gainful competitive employment," insofar as that employment would require repetitive trunk movements; prolonged trunk positions, without allowance to change positions as needed; repetitive heavy lifting or carrying; repetitive traversing of stairs; prolonged standing or walking, especially on concrete surfaces, and repetitive kneeling, squatting or crawling. (Tr. 543) He opined that these limitations "would likely be permanent" but allowed that a "more objective delineation" would require a functional capacity evaluation. (*Id.*) He also noted that his opinions were based upon a single office examination without benefit of medical records or radiographs. (*Id.*)

D. *Medical Record Review by State Agency Physicians (Tr. 518-24)*

State agency physicians reviewed Plaintiff's medical evidence at the initial stage of the disability process and concluded: (1) that Plaintiff was able to perform light work and (2) that Dr. Zeimet's opinion was inconsistent with the objective medical evidence on file. The reviewing physicians' report also included the observation that, given his medically determinable impairments, it was reasonable for Plaintiff to have some pain and require limitations. The reviewing physicians found it appropriate that Plaintiff should be restricted from forceful pushing with his lower extremities to avoid exacerbation of his symptoms.

E. *Investigation by the Office of Inspector General of the SSA (SSA OIG) (Tr. 401-12)*

An investigation conducted on behalf of the SSA OIG by the Cooperative Disability Investigation unit in October of 2008, due to the disparity between Plaintiff's allegations of pain and the objective medical data, found that while in the hospital Plaintiff limped before and after entering the X-ray suite, but that upon exiting the hospital his gait was normal and fluid.

F. *Dr. Wen's Medical Source Statements*

1. Dr. Wen's August 13, 2009 Medical Source Statement (Tr. 525-31)

Dr. Wen observed that he had been treating Plaintiff since 2003 for chronic low back pain, chronic degenerative disc disease, chronic knee pain and chronic anxiety. Dr. Wen opined that the prognosis for all of these conditions was poor. He stated that Plaintiff's impairments could be expected to last at least twelve months or longer and that Plaintiff was not a malingerer. Dr. Wen also stated that Plaintiff's psychological symptoms contribute to his physical symptoms and that he frequently experiences symptoms severe enough to interfere with the attention focus needed to perform simple work tasks. He also opined that Plaintiff was incapable of even low stress jobs.

Dr. Wen identified Plaintiff's exertional abilities and restrictions finding him able to: walk for one or two blocks without resting; sit for no more than twenty to thirty minutes at a time, sit, stand or walk for a total of two hours in an eight hour work day; occasionally lift ten pounds, rarely lift twenty pounds and never lift fifty pounds; occasionally climb stairs; and frequently reach, handle, grip or feel. In Dr. Wen's opinion, Plaintiff would require a job that permitted him to change positions at will between sitting, standing and walking, and would need to recline or elevate his feet for a few minutes every one to two hours. Plaintiff also would require unscheduled restroom breaks in an eight-hour day and would likely be absent from work more than four days per month.

### 2. Dr. Wen's September 2, 2010 Medical Source Statement (Tr. 548-54)

On September 2, 2010, Dr. Wen completed a second Medical Source Statement in which he again stated that he had been treating Plaintiff since 2003, and that Plaintiff's impairments could be expected to last at least twelve months or longer and that Plaintiff was not a malingerer. Dr. Wen observed that emotional and psychological factors, specifically, anxiety and depression, contributed to Plaintiff's limitations and frequently interfered with attention and concentration. He again opined that Plaintiff was incapable of even low stress jobs.

Dr. Wen again identified Plaintiff's exertional abilities and restrictions finding him able to: walk for one to two city blocks; sit for twenty minutes at a time, stand for thirty minutes at a time; sit for less than two hours for less than a total of two hours in an eight hour work day; stand or walk for less than a total of two hours in an eight hour work day; occasionally lift ten pounds, rarely lift twenty pounds and never more; never twist, stoop, bend or climb ladders; and rarely kneel, crouch/squat or climb stairs. Dr. Wen again opined that Plaintiff would require a job that permitted him to change positions at will between sitting, standing and walking, and would need to recline or elevate his feet for a few minutes every three to four hours. Plaintiff also would require a restroom in close proximity, unscheduled restroom breaks in an eight-hour day, would have good days and bad days and would likely be absent from work more than four days per month.

### 3. Dr. Wen's September 1, 2011 Medical Source Statement (Tr. 614-17)

On September 1, 2011, Dr. Wen again provided a source statement, noting that during an eight hour work day Plaintiff was able to sit for two hours, stand for one hour and walk for one hour. He further opined that Plaintiff could: lift ten pounds, frequently, and twenty pounds, occasionally, and occasionally stoop. He predicted that Plaintiff would be absent from work three or more days per month, would arrive late or leave early three or more days per month,

would require more than three breaks during the work day and would need to lie down or nap during the work day.

G. *Dr. Birkenmeir's December 10, 2012 Letter (Tr. 631-33)*

On December 10, 2012, Dr. Birkenmeier completed an opinion letter in response to Plaintiff's request. He opined that Plaintiff's condition had deteriorated in the twelve years since his fall and identified more recent symptoms involving Plaintiff's legs such as abnormal sensation and weakness. (Tr. 631) He also noted conditions in the low back causing strain of the ligaments and musculature, as well as disc bulging and desiccation. *Id.* He further opined that the discs at L3, L4 and L5 were bulging into the spinal canal and suggested that the magnitude of the disc bulges might be greater than that evidenced on MRI due to the fact that the MRI is performed while the patient is lying down. (Tr. 633) He stated that conditions such as Plaintiff's are known to cause pain and dysfunction in the low back as well as weakness and abnormal sensations in the legs. (*Id.*)

**V. The ALJ's Decisions and Appeals Council Proceedings (Tr. 15-27, 119-37, 143-44)**

A. *The December 10, 2010 Decision of the ALJ*

In the December 10, 2010 decision, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2006, and that he had not engaged in substantial gainful activity since that date, the amended alleged onset date of disability. The ALJ further found that Plaintiff's impairments: sciatica, chronic low back pain right knee pain, and left hip pain, although severe, did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. In addition, the ALJ also found that Plaintiff had the mental impairments of depression and anxiety, but that these impairments were "non-severe" because they did not significantly limit Plaintiff's physical or mental ability to do basic work activities.

The ALJ determined that Plaintiff had the RFC to perform less than the full range of sedentary work.[19]  Specifically, the ALJ found that Plaintiff could:  occasionally lift and or carry up to ten pounds; sit for about twenty minutes at any one time before having to stand at a workstation for three minutes; occasionally climb ramps and stairs, balance and stoop; never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds.  In addition, the ALJ held that Plaintiff must avoid exposure to vibration and might require a one-handed assistive device to ambulate and balance.  The ALJ also held that, due to medication side-effects, the Plaintiff could only understand, remember and carry out simple instructions and make only simple work-related decisions.  In addition, Plaintiff could handle occasional changes in work processes and environment but could not maintain face-to-face contact with the general public and could not maintain strict production quotas because the pace of his work might vary over the course of a work day or work week.  The ALJ found Plaintiff unable to perform his past relevant work and determined that "transferability of job skills" was not material to his disability determination because the Medical Vocational Rules would support a finding that Plaintiff was not disabled whether or not he had transferrable job skills.  Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that the vocational expert testimony supported a finding that Plaintiff could perform other work existing in significant numbers in the national economy.  Specifically, the ALJ determined that Plaintiff could perform the requirements of representative occupations of order clerk, production checker, and parking lot attendant.  The ALJ thus found that Plaintiff was not under a disability from June 30, 2006, through the date of the decision.

---

[19]    "Sedentary work" "involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are

B. *The Appeals Council Decision (Tr. 143-44)*

The Appeals Council remanded the case to the ALJ on the ground that the VE testimony was not consistent with the DOT. Specifically, the Appeals Council objected to the ALJ's failure to reconcile his recommendation that Plaintiff be afforded a "sit /stand option," with the fact that the DOT descriptions of the jobs he recommended for Plaintiff failed to include such an option. In addition, the ALJ failed to clarify whether: (1) the order clerk job would require face-to-face interaction with the public, (2) the lens inserter job requires production quotas and (3) the production checker position is semi-skilled. The ALJ was ordered to obtain supplemental evidence from a VE on these issues to clarify the effect of the assessed limitations on Plaintiff's occupational base and to resolve discrepancies between the VE's testimony and the information found in the DOT.

C. *The October 23, 2012 Decision of the ALJ*

In his October 23, 2012 decision, which stands as the final decision of the Commissioner, the ALJ found that Plaintiff met the insured status requirements of the Act through June 30, 2006, and that he had not engaged in substantial gainful activity since that date. The ALJ further found Plaintiff's degenerative disc and joint disease were severe impairments but that they did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ determined that Plaintiff had the RFC to perform light work[20] with the further limitations that he could: lift and or carry no more than twenty pounds occasionally and

---

required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[20] "Light work" "involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work. . . . " 20 C.F.R. § 404.1567(b).

ten pounds frequently; only walk up to two hours in an eight-hour day; climb ramps and stairs for a total of two hours in an eight-hour day; never climb ladders, ropes, or scaffolds; and only occasionally stoop, kneel crouch or crawl.  In addition, the ALJ held that Plaintiff must avoid hazards such as dangerous machinery and unprotected heights, never be required to walk on uneven surfaces, would require an occupation that permitted him to alternate between sitting and standing at will.

The ALJ found Plaintiff unable to perform his past relevant work and determined that "transferability of job skills" was not material to his disability determination because the Medical Vocational Rules would support a finding that plaintiff was not disabled whether or not he had transferrable job skills. Considering Plaintiff's age, education, work experience and RFC, the ALJ determined that the vocational expert testimony supported a finding that Plaintiff could perform other work existing in significant numbers in the national economy.  Specifically, the ALJ determined that Plaintiff could perform the requirements of representative occupations such as cashier, inspector and hand packager, and parking lot attendant.  The ALJ thus found that Plaintiff was not under a disability from June 30, 2006, through the date of the decision.

## VI. Applicable Law and Standard of Review

To be eligible for DIB and SSI under the Social Security Act, a plaintiff must prove that he is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a plaintiff is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). At step 1, the Commissioner considers whether the plaintiff is engaged in substantial gainful activity. If so, disability benefits are denied. At step 2, the Commissioner decides whether the plaintiff has a "severe" medically determinable impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the plaintiff's impairment is not severe, then he is not disabled. If the impairment is severe, the Commissioner then determines at step 3 whether such impairment is equivalent to one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If a plaintiff's impairment meets or equals one of the listed impairments, he is conclusively disabled. At step 4, the Commissioner establishes whether the plaintiff's impairment prevents him from performing his past relevant work. If the plaintiff can perform such work, he is not disabled. Finally, if the plaintiff is unable to perform his past work, the Commissioner continues to step 5 and evaluates various factors to determine whether the plaintiff is capable of performing any other work in the economy. The plaintiff is entitled to disability benefits only if he is not able to perform other work.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). The "substantial evidence

test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The [plaintiff's] vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The [plaintiff's] subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the [plaintiff's] impairments.
6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the [plaintiff's] impairment.

*Stewart v. Sec'y of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court also must consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions," the Commissioner's decision must be affirmed. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). The decision may not be reversed merely because substantial evidence also could support a contrary outcome. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

**VII**. **Discussion**

A. *The ALJ's RFC Determination is Based upon Substantial Evidence on the Record*

Plaintiff first asserts that, given his limitations as evidenced by the record, the ALJ erred in assigning him an RCF for light work. Specifically, Plaintiff asserts that the ALJ failed to take

into account various elements of the objective medical evidence, Plaintiff's own testimony, the opinions of Plaintiff's treating physician and the side-effects of Plaintiff's medications.

At the fourth step of the sequential evaluation process, the ALJ assesses the plaintiff's RFC. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv). The RFC represents the most a plaintiff can do despite his limitations and is based upon all the relevant evidence in the record. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Although the ALJ is not restricted solely to the consideration of medical evidence in evaluating the RFC, the ALJ's determination must be based upon at least some evidence from a medical professional and such evidence should address the plaintiff's ability to function in the workplace. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); *see also Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004) (citing *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002)); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). It is improper for an ALJ to reach his own medical conclusion about the evidence. *See Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir. 1989). In addition, a conclusion regarding credibility is not the equivalent of proving by medical evidence that a plaintiff has the RFC for other work. *Estabrook v. Apfel*, 14 F.Supp.2d 1115, 1122 (S.D. Iowa 1998) (citing *Soth v. Shalala*, 827 F.Supp. 1415, 1417 (S.D. Iowa 1993)).

Having considered the portions of the objective medical record that Plaintiff contends support an RFC for less than sedentary work, the Court is satisfied that the objective medical evidence here supports the ALJ's RFC determination. In evaluating for substantial evidence, the Court must "consider the evidence that supports the Commissioner's decision as well as the evidence that detracts from it." *Phillips v. Colvin*, 721 F.3d 623, 625 (8th Cir. 2013) (internal quotation omitted). Here, in arguing that the ALJ erred in assigning an RFC for 'light work,' Plaintiff, in essence, asks the Court to consider only the evidence that might support a finding of disability. Even if this were a case where "after reviewing the entire record, it [were] possible to

draw two inconsistent positions," *Anderson*, 696 F.3d at 793, the Court would be constrained to affirm the position adopted by the Commissioner. *See Young*, 221 F.3d at 1068. The Court has no authority to consider only the evidence that might support a finding of disability. *Phillips*, 721 F.3d at 625 (internal quotation omitted). In this case the Court finds substantial evidence on the record to support the ALJ's decision to assign an RFC for 'light work.'

The Court also rejects Plaintiff's assertion that the ALJ failed to consider the side-effects of Plaintiff's medications. The ALJ explicitly noted Plaintiff's testimony that, at times, his narcotic pain medications caused dizziness, nausea, fatigue, photophobia, confusion and loss of focus. (Tr. 20, 59-60) Substantial evidence on the record as a whole supports the ALJ's implicit determination that the side-effects had little effect on his assessment of Plaintiff's RFC. Despite his allegations of side-effects, Plaintiff continued to drive a motor vehicle and spent a good deal of time reading and using the Internet. In addition, although aware of Plaintiff's alleged side-effects, Plaintiff's treating physicians imposed no restrictions on his ability to drive or engage in other activities. *Cf. Vandenboom v. Barnhart*, 421 F3d 745, 749-50 (8th Cir. 2005) (holding that the ALJ may take into account a physician's failure to impose restrictions in response to reported side-effects).

The medical evidence also calls into question the degree to which the side-effects contributed to Plaintiff's level of impairment. On several occasions, Plaintiff's physicians attempted to restrict his use of narcotic pain relievers and offered him a non-narcotic option for pain relief, but Plaintiff rejected these options and failed to avail himself of the opportunity to reduce the impact of his medications on his functioning. To the extent that this evidence undermines Plaintiff's credibility, the Court recognizes that a conclusion regarding credibility is not the equivalent of proving by medical evidence that a plaintiff has a certain RFC. *Id.* The

ALJ is, however, entitled to consider evidence indicating the severity and therefore, the impact of reported side-effects in making his RFC determination. *Id.*

The Court addresses below the ALJ's consideration of Dr. Wen's medical source opinions and the ALJ's credibility determinations regarding Plaintiff's testimony and subjective complaints.

B. *The ALJ gave Proper Weight to the Opinion of Dr. Wen*

Plaintiff next argues that, the ALJ erred by failing to afford at least substantial weight to Dr. Wen's medical source opinions.

In making an RFC determination, the ALJ properly considers medical source opinions, which are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of the plaintiff's impairments, including his symptoms, diagnosis and prognosis, what he can still do despite his impairments, and his physical and mental restrictions. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). In deciding what weight to afford a medical source opinion, the ALJ considers several factors. These factors include: whether the physician examined the plaintiff; the length, nature, and extent of the treatment relationship; how well the physician supported the opinion with relevant evidence, including medical signs and laboratory findings; how consistent the physician's opinion was with the record as a whole; whether the physician was a specialist; and any other factors that support or contradict the physician's opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

When a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with the other substantial evidence in the record, the ALJ should afford that opinion "controlling weight." *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ cannot afford the opinion "controlling weight," he should consider several factors, including those mentioned above, to determine whether the

opinion should be afforded a lesser weight. *See* 20 C.F.R. §§ 404.1527, 416.927. If a treating

source's opinion is not entitled to controlling weight, it "should not ordinarily be disregarded and

is entitled to substantial weight." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000); *see also* 20

C.F.R. §§ 404.1527, 416.927. But the ALJ may give a treating doctor's opinion limited weight if

it includes only conclusory statements or is inconsistent with the record. *Samons v. Astrue*, 497

F.3d 813, 818 (8th Cir. 2007) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006); and

*Chamberlain v. Shalala,* 47 F.3d 1489, 1494 (8th Cir. 1995)). Regardless of the weight he

decides to afford the opinion of a medical source, the ALJ must "always give good reasons" for

doing so. *Singh*, 222 F.3d at 452.

In this case Dr. Wen, a treating physician, submitted three medical source opinions in

check box format dated August 2009, September 2010, and September 2011. Taken together

these opinions express Dr. Wen's view that Plaintiff is restricted to less than sedentary exertion.

Dr. Wen also opined that Plaintiff could only sit for two hours in an eight-hour work day, stand

for one hour in an eight-hour work day, and walk for one hour in an eight-hour work day. He

further stated that Plaintiff would need to nap or recline during the work day; and would require

at least three breaks during the eight-hour work day. In addition, he opined that Plaintiff would

miss more than four days of work a month due to his impairments, and that his pain would

preclude him from maintaining sustained focus on simple tasks in a full time work setting. (Tr.

526-31, 549-54, 614-17; Ex. 22)

The ALJ gave "little weight" to Dr. Wen's opinions and cited several reasons for

discounting them. (Tr. 21-25) Specifically, the ALJ considered inconsistencies between Dr.

Wen's opinions and his own treatment notes; inconsistencies between Dr. Wen's opinions and

the objective medical evidence of record; the relatively conservative treatment Plaintiff received;

the fact that that Dr. Wen's opinions appeared to be based primarily on Plaintiff's subjective

complaints, rather than the signs, symptoms, test results or other diagnostic findings; Plaintiff's failure, from 2004 to 2008, to seek treatment; the conclusory and contradictory nature of Dr. Wen's opinions; and their intrusion upon areas outside of Dr. Wen's expertise. *Id.*

Plaintiff asserts, however, that the ALJ erred because Dr. Wen's opinions were consistent with his treatment notes and Plaintiff's testimony. Plaintiff also alleges that Dr. Wen's opinions were consistent with the findings and opinions of Dr. Zeimet and Dr. Martinson and that the ALJ failed to consider Plaintiff's inability to afford treatment in discounting Dr. Wen's opinion.

In deciding what weight to afford Dr. Wen's opinions, the ALJ properly considered how well Dr. Wen had supported them with relevant evidence, including medical signs and laboratory findings, and how consistent his opinions were with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ concluded that Dr. Wen's opinions were unsupported by medically acceptable clinical and laboratory diagnostic techniques and inconsistent with the other substantial evidence in the record. The Court cannot conclude that the ALJ erred in making this determination. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (stating that "[a] treating physician's checkmarks on an MSS form may be discounted if they are contradicted by other objective medical evidence in the record"). For example, the ALJ properly considered that diagnostic imaging of Plaintiff's back showed normal alignment, mild bulging and asymmetries, and no compression, deformity, spondylolisthesis, stenosis, herniation, extrusion, or nerve root impingement. (Tr. 21, 22, 25, 413-14, 430-31, 499, 517, 629); *see Choate v. Barnhart¸* 457 F.3d 865, 871 (8th Cir. 2006) (concluding that the ALJ properly discounted a treating physician's opinion that lacked support in the objective medical evidence); *cf. Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the ALJ did not err in discounting the plaintiff's complaints of pain because a "battery of diagnostic tests" was consistently unremarkable). In addition, the significant limitations Dr. Wen expressed in his opinions are not reflected in his treatment notes

or elsewhere in the medical records. *See Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011) (determining that the ALJ properly discounted a medical source statement when the physician's notes "reported no findings of significant limitation or inability to work").

In considering the nature of the treatment relationship that Plaintiff had with Dr. Wen, the ALJ also properly considered that, from 2004 through 2008, Dr. Wen did not see Plaintiff in his office and treated him by prescribing medication over the telephone. *See Page v. Astrue*, 484 F.3d 1040, 1044 (8th Cir. 2007) (holding that an ALJ may consider a plaintiff's failure to seek treatment in determining the proper weight to afford a treating physician's opinion) (internal citation omitted).

Substantial evidence of record also supports the ALJ's determination that Dr. Wen's opinions regarding Plaintiff's exertional abilities are inconsistent with his own treatment notes. (Tr. 24) In June of 2003 and August of 2003, shortly after he began treating Plaintiff, Dr. Wen noted that Plaintiff had full extension, normal range of motion, and no effusion in his right knee. (Tr. 428, 496) In June of 2003, October of 2003, January of 2008, and August of 2010, Dr. Wen noted that Plaintiff had normal curvature in his spine, no specific areas of tenderness in his back, negative straight-leg raising signs, and good flexion and extension. At the very least, the above noted physical findings fail to support Dr. Wen's opinion that Plaintiff was capable of less than the full range of sedentary exertion. *See Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (holding that an ALJ properly discounted treating physician's opinion that was inconsistent with his own treatment notes).

Dr. Wen's treatment notes also contained internal inconsistencies which justified the ALJ's decision to afford his opinions lesser weight. For purposes of explaining the gaps in Plaintiff's treatment, Dr. Wen characterized Plaintiff's condition as "stable," but for purposes of assessing Plaintiff's exertional limitations, he opined that Plaintiff's condition had deteriorated

over time. In addition, where, as here, the ALJ determines that the Plaintiff's own testimony lacks credibility, the consistency of that testimony with a treating physician's opinion does not augment, but rather detracts from the weight to be afforded that opinion. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007)

In addition, the ALJ properly discounted Dr. Wen's opinions due to their inconsistency with Plaintiff's reported daily activities. (Tr. 20, 95-99). Plaintiff reported severe, debilitating pain but also indicated that he was able to manage most of his personal needs such as grooming, light cleaning, cooking, shopping, driving, performing some yard work, taking out his trash, and attending church and family events. He also reported playing pool and a limited ability to fish and swim. These activities are incongruous with Dr. Wen's opinion that Plaintiff was limited to less than a sedentary exertional level and the ALJ properly considered this incongruity in discounting Dr. Wen's opinion. *See Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008) (discounting a medical source opinion on the ground that the "[plaintiff's] activities of daily living do not reflect the physical limitations found by [the doctor]").

Plaintiff's argument that the opinions of Dr. Wen should have been afforded greater weight because they were consistent with Plaintiff's own testimony is not persuasive. Where it appears that the ALJ's opinion derives from the plaintiff's subjective reporting regarding his condition rather than the physician's own findings and the objective medical evidence, the physician's opinion is properly discounted. *See Kirby*, 500 F.3d at 709 (observing that "[t]he ALJ was entitled to give less weight to [a physician's] opinion, because it was based largely on [the plaintiff's] subjective complaints rather than on objective medical evidence").

The Court cannot agree with Plaintiff's assertion that Dr. Wen's opinions should have been afforded greater weight because they were consistent with the findings of the consultative examiners, Drs. Zeimet and Martinson. (Tr. 22-23). The ALJ rejected the conclusions of these

consultative examiners for valid, appropriate reasons. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (holding that "[t]he ALJ [also] may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole") (citing *Pearsall,* 274 F.3d 1211, 1218-19 (8th Cir. 2001)).  The ALJ rejected Dr. Zeimet's opinion that Plaintiff could not work a normal eight-hour day as inconsistent with the record as a whole and with Dr. Zeimet's own findings. *See* (Tr. 22, 511-12); s*ee* also 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (stating that "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

The ALJ also properly rejected Dr. Martinson's opinion that Plaintiff was potentially limited in his ability to sustain ongoing competitive gainful employment, concluding that Dr. Martinson's opinion was vague and based upon principles of vocational qualification, an area outside his expertise.  *See Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (holding that the ALJ properly discounted a medical opinion where, among other things, it was conclusory and lacked elaboration); *Ellis v. Barnhart*, 392 F.3d 988, 994–95 (8th Cir. 2005) (refusing to assign substantial weight to a physician's opinion because his statement that the plaintiff could not work was conclusory and touched upon the ultimate issue of disability – a question reserved for  the Commissioner).

Moreover, the ALJ was entitled to consider that Dr. Wen's opinions were inconsistent with the findings of another treating physician, the orthopedic surgeon, Dr. Greene.  *Choate*¸ 457 F.3d at 871 (concluding that the ALJ properly discounted a treating physician's opinion that lacked support in the objective medical evidence).  Unlike Dr. Wen, Dr. Greene began treating Plaintiff just two months after his August 1999 fall.  Dr. Green consistently noted that Plaintiff's spine was straight, his gait and reflexes were normal, his sensory and motor abilities were intact, and his straight-leg raising was negative.  (Tr. 414, 415, 417, 419, 426)  Dr. Greene also opined

that Plaintiff had responded "quite well" to physical therapy, was not experiencing any significant back pain, and could return to work in November of 1999. (Tr. 21, 415) The record does not indicate the occurrence of any traumatic event between Plaintiff's 1999 fall and his June 30, 2006 alleged onset date. Therefore, there is no reason to assume that the passage of time rendered Dr. Green's findings inaccurate or less persuasive than Dr. Wen's. In fact given the gaps in Dr. Wen's treatment of Plaintiff, there is no reason to afford greater weight to Dr. Wen's opinion regarding Plaintiff's condition on June 30, 2006 than to Dr. Greene's observations. Dr. Greene's assessment supports the ALJ's RFC determination and provides further support for the conclusion that Dr. Wen's opinions were inconsistent with the medical evidence as a whole. *See e.g., Castro v. Barnhart*, 119 F. App'x 840, 844 (8th Cir. 2005) (finding it significant that no precipitating event caused the alleged deterioration in plaintiff's condition and increased pain).

C. *The ALJ's Consideration of Plaintiff's Subjective Complaints*

Plaintiff also argues that the ALJ erred in his consideration of Plaintiff's subjective complaints by failing to make sufficiently explicit credibility findings.

Under Eighth Circuit law an ALJ, in the course of making his RFC determination, is required to consider the credibility of a plaintiff's subjective complaints in light of the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See* 20 C.F.R. §§ 404.1529, 416.929. The factors identified in *Polaski* include: a plaintiff's daily activities; the location, duration, frequency, and intensity of his symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of his medication; treatment and measures other than medication he has received; and any other factors concerning his impairment-related limitations. *See Polaski*, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ is not required, however, to discuss each *Polaski* factor and how it relates to the plaintiff's credibility. *See Partee v. Astrue*, 638 F.3d at 860, 865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to

discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted); *Samons*, 497 F.3d at 820 (stating that "we have not required the ALJ's decision to include a discussion of how every *Polaski* factor relates to the [plaintiff's] credibility"). In addition, this Court is required to review the ALJ's credibility determination with deference. *See Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination").

In this case, the Court is satisfied that the ALJ properly considered Plaintiff's subjective complaints under the *Polaski* rubric. *See* (Tr. 20-25). The ALJ explicitly acknowledged the requirements of 20 C.F.R. §§ 404.1529 and 416.929 for evaluating subjective complaints. (Tr. 19) The ALJ was not required to present credibility findings in a designated section of his opinion and did not err in weaving his credibility analysis throughout his opinion. *See Wiese v. Astrue*, 552 F.3d 728, 733-34 (8th Cir. 2009) (holding that the ALJ is not required to make a formal finding with respect to credibility). In addition, the ALJ was not required to explicitly discredit particular subjective complaints. *See Watkins v. Astrue*, 414 F. App'x 894, 895-96 (8th Cir. 2011) (holding the ALJ did not err in failing to discuss each of the credibility factors where the ALJ generally observed that the plaintiff's complaints of disabling pain were unsupported by the objective medical evidence, inconsistent with his failure to seek ongoing treatment, and inconsistent with some of his reported daily activities).

Plaintiff correctly observes that an ALJ cannot merely invoke *Polaski*, or discredit a plaintiff's subjective complaints as unsupported by medical evidence, without providing some explanation for his credibility determination. *See Dukes v. Barnhardt*, 436 F.3d 923, 928 (8th Cir. 2006); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). Here, however, the ALJ properly

considered Plaintiff's complaints and discussed numerous reasons why they were not entirely credible. (Tr. 18-25) *See Gregg*, 354 F.3d at 713. Although, as Plaintiff points out, the ALJ did not explicitly state which of Plaintiff's allegations he found lacking in credibility, it is apparent from the opinion as a whole that the inconsistencies between the objective medical evidence, Plaintiff's own claims, his daily activities, and the intermittent history of his treatment form the basis of the ALJ's finding. (Tr.19); *see Wiese*, 552 F.3d at 733-34; *Page*, 484 F.3d at 1044 (8th Cir. 2007) (observing that "[w]hile not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem"). Plaintiff's assertion that the ALJ must make an express credibility determination *with respect to each factor* misstates Eighth Circuit law. *See Samons*, 497 F.3d at 820 (upholding an ALJ's decision to discredit a plaintiff's subjective complaints where the ALJ mentioned the general requirements of *Polaski*, made specific reference to one or two of the *Polaski* factors, and noted contradictions between the plaintiff's hearing testimony and her statements as recorded in the medical records); *Dukes*, 436 F.3d at 928 (requiring only that the ALJ "make an express credibility determination that explains, based on the record as a whole, why the claims were found to be not credible") Moreover, the Court is not persuaded that *Martinez v. Astrue*, 630 F.3d 693, (7th Cir. 2011), the Seventh Circuit case on which Plaintiff relies, mandates express credibility determinations with respect to each *Polaski* factor. And even if *Martinez* creates such a requirement, this Court is obliged to follow the well-established law of this Circuit on the issue rather than the law of the Seventh Circuit.

Here, the ALJ considered numerous factors in assessing Plaintiff's credibility. The ALJ noted that the severity of Plaintiff's reported impairments was not consistent with his course of treatment and that Plaintiff's condition and complaints improved with treatment, including physical therapy, a TENS unit, and pain medications. This evidence persuaded the ALJ that Plaintiff's complaints of disabling, uncontrollable pain were not credible. *Brown v. Astrue*, 611

F.3d 941, 955 (8th Cir. 2010) (holding that "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling") (internal quotation marks and citation omitted). In addition, the ALJ correctly considered that Plaintiff responded well to conservative treatment in the form of medication and physical therapy (despite his failure to attend all of his physical therapy appointments) and did not require more invasive treatment such as surgery. (Tr. 21, 415, 433 452, 472, 496, 498). *See Gowell*, 242 F.3d at 796 (internal citation omitted); *see also Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (holding that "[a] failure to follow a recommended course of treatment also weighs against a plaintiff's credibility").

The ALJ also properly discounted Plaintiff's subjective complaints due to Plaintiff's failure to obtain treatment for extended periods of time. *Renstrom*, 680 F.3d at 1066-67. The ALJ noted that from 2004 to 2008 Plaintiff had a significant gap in treatment. (Tr. 21-22, 24-25) Plaintiff asserts that his failure to seek treatment during this time period was due to financial difficulty and his lack of insurance but the Court notes that nothing in the record demonstrates that he attempted to seek no-cost or low-cost treatment. Given the limitations and severity of pain Plaintiff alleges, one would expect him to make such efforts. The failure to seek such alternatives, for example, to continue the exercises he learned in physical therapy in another less costly setting, further undermines the credibility of Plaintiff's subjective complaints. The ALJ properly considered this failure in discounting those complaints. *See Page*, 484 F.3d at 1044 (stating that "[w]hile not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem"); *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (holding that the plaintiff's failure to find low-cost or no-cost medical treatment was inconsistent with and undercut credibility of the plaintiff's subjective complaints of pain) (internal citation omitted).

Furthermore, the ALJ appropriately discounted Plaintiff's subjective complaints of pain on the basis of unremarkable diagnostic test results, physical findings and recommendations that

Plaintiff was able to return to work.  *See Gowell*, 242 F.3d at 796; *Howe v. Astrue*, 499 F.3d 835, 840 (8th Cir. 2007).  The ALJ also considered Plaintiff's daily activities and found that these activities indicated a lesser impairment than Plaintiff claimed in his testimony.  *See Halverson*, 600 F.3d at 932 (holding "that acts which are inconsistent with a plaintiff's assertion of disability reflect negatively upon that plaintiff's credibility") (internal quotation and citation omitted).  The ALJ noted that Plaintiff maintained extensive daily activities, including driving, shopping for groceries, preparing meals, washing dishes, taking out the garbage, going to the library, attending church and his son's scouting activities, as well as fishing and swimming.  (Tr. 20, 95-99)  Although not conclusive, a plaintiff's ability to maintain extensive daily activities suggests that a plaintiff is not as limited as alleged.[21]  *See Clevenger v. Soc. Sec. Admin.*, 576 F.3d 971, 976 (8th Cir. 2009).  The ALJ properly determined that when taken together, these elements and inconsistencies in the record undermined the credibility of Plaintiff's allegations.

Moreover, the ALJ's decision contains sufficient detail and analysis to support his determination that Plaintiff's subjective complaints were not entirely credible.  For example, the ALJ identified numerous elements of the medical evidence which contradicted Plaintiff's complaints.  (Tr. 25).  This evidence included MRIs, X-rays and thermal imaging of Plaintiff's back, (Tr. 21, 22, 25, 42, 413-14, 430-31, 499, 517, 629), and numerous instances of normal findings on physical examination by Drs. Greene and Wen, and Dr. Greene's assessment that Plaintiff could return to work as early as November 1999.  (Tr. 21, 22, 24, 414, 415, 417, 419, 426, 428, 496, 503, 506, 546)

In sum, the ALJ adequately and appropriately discussed many *Polaski* factors in discrediting Plaintiff's credibility.  *Partee*, 638 F.3d at 865.  Because the ALJ gave good reasons

---

[21]    In this respect, the ALJ also could have considered the report of the SSA OIG investigators suggesting that Plaintiff modified his posture and gait when in the presence of

for discounting Plaintiff's credibility, the Court defers to the ALJ's credibility findings. *See Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011) (reiterating the principle that "[i]f the ALJ discredits a plaintiff's credibility and gives a good reason for doing so, [the reviewing court] will defer to its judgment even if every factor is not discussed in depth") (internal quotation and citation omitted).

## VII. Conclusion

Therefore, for all of the foregoing reasons, the Court concludes that the Commissioner's adverse decision is based upon substantial evidence on the record as a whole and the decision of the Commissioner should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 11th day of May, 2015.

*/s/ John N. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

---

medical providers. (Tr. 401-12).